The next cases on the calendar this morning are to be heard in tandem, and I hope counsel has conferred about how we might proceed. We have 17-4151, Knopf v. Esposito, Dorsey and Whitney, et al., number 18-668, 18-2193, Knopf v. the same defendants, 19-1744, Knopf v. Dorsey and Whitney, and those are to be heard basically together. And then the final case, 18-661, Knopf v. Phillips, we set separate argument times for. Does this work for you, counsel? Yes? Okay. Then let me have counsel's name. Please be seated, and we will proceed. Good morning, Your Honors. My name is Eric Berry. Could you move over and step in, speak right into the microphone? That will enable Judge Winter to hear you more clearly, and me, too. How is this? Much better. Thank you. Good morning, Your Honors. My name is Eric Berry. I represent the appellants and plaintiffs below Michael and Norman Knopf. This case, this appeal, seeks to reinstate the Knopf's claims that the defendants conspired to violate their right to notice an opportunity to be heard in connection with an attempt by Defendant Michael Sanford to obtain clarification of two First Department orders that the Knopf's had obtained in order to protect their ability to execute on the assets of the defendant. I'm sorry. Be careful to speak into the microphone. I'm sorry. I can't hear you. In order to protect their ability to execute on assets that Mr. Sanford had acquired with loans from the Knopf's, the first order, dated October 22, 2015, simply imposed an escrow requirement. The second order that we're relying upon was based on Sanford's motion to vacate the October 22 order. On December 29, it's a two- Could you turn to your claim of a 1983 conspiracy and what factual allegations underlie that claim? I cannot hear what Judge Winters is saying. He wanted to know what factual allegations you have that underlie your Section 1983 conspiracy claim. What are the facts that underlie the conspiracy claim? The conspiracy itself is based on the following evidence of collusion. I'm sorry. I'm going to ask you again to move the microphone closer to you. Yeah. I can't hear you. The conspiracy claim is based on the following evidence of collusion. Is that better, Judge Winter? I did not understand what he was saying. The conspiracy claim is based on the following evidence of collusion. Okay. What? There was this order that Mr. Sanford wanted to get clarified. Instead of moving for reconsideration or moving to quiet title, he called up one of his lawyers and spoke about what was an alternative means of obtaining clarification. He spoke with- I think Judge Winter is trying to ask a question. Go ahead, Judge Winter. What were the constitutional rights that plaintiff was being deprived of? What were the constitutional rights that plaintiff was being deprived of? Notice an opportunity to be heard in connection with the informal proceeding in which Ms. Ringel, the wife of Defendant Frank Esposito, clarified the orders at issue to Mr. Sanford's benefit. One of the orders- All right. Now, do I understand correctly that you are claiming that the sale of the penthouse took place because this lawyer in the appellate division who was married to one of the lawyers in the case opined that there was no legal restriction? She did opine that there was no legal restriction. And you allege that that caused the sale of the penthouse. I'm not hearing the question, but he's saying you allege that that caused the sale of the penthouse. It caused the sale of the penthouse. It's admitted. At 490 and 491, the record, Mr. Sanford- After that order, the sale would not have taken place? Right. And that's why we- The answer is you do allege that or you do not? We do recognize that the June 16 order is a defense here. I have no clue as to what Judge- I can't hear him at all. Judge Winter is asking, I believe, whether you believe what your position is as to the effect of the June order and whether the sale would have taken place in any event after the appellate division clarified its position by entering that order. I disagree with that. You believe it would not have taken place? The actual sale would not have taken place because when we found out about this ex parte communication, on February 24, one day- on February 25, one day after we found out about the sale, not knowing anything about the ex parte communication, we go into the First Department and get a new escrow order. The new escrow order stated that the proceeds, the remaining proceeds, had to be paid into a new escrow. That's Justice Moskowitz's February 25, 2016, order. Then, on March 24, a full panel of the appellate division, a full panel of the First Department issued an injunction which froze the $430,000 in proceeds in the Moskowitz-ordered escrow. Let me make sure I understand your argument, then. You're saying that if there had not been this informal conversation, which you say violated the due process rights of your client, if they had had to go before the court to get clarification and the court had told you at that time in January, you don't have a restraining order anymore, right? That you would have immediately then sought a new one and would have prevented the proceeds from being dissipated? Is that what your position is? In fact, we did do that. You did that in February, you're saying. In March, too, we got a restraining order. You're saying you would have been able to do that in January before some of the monies were dissipated? That's correct. And you know that because the circumstances were identical. It's not that we are excluded from the call per se. It's that we would have learned on the call that there was a plan to sale and not distribute the proceeds, and then just as on February 24, we obtained an escrow order, and on March 24, we obtained a freeze order, we would have obtained those February 25 and March 24 orders before the sale took place. That would have frozen the assets. Those assets were frozen. The remaining assets were frozen, and we collected them. You say you would have done all these things, but in June 2016, the Appellate Division said that her advice was correct, that the November order had eliminated all restraints. The Appellate Division did ultimately agree with Ms. Ringel's advice and held that the argument that we would have made based on the December 29 order was incorrect. I think Judge Winters tried to respond. Could I speak? Yeah. In her order, if her advice was correct, even though improperly given, if her advice was correct and the court has confirmed that it was correct, how have you suffered any damages? The answer is presented by this court in its Motors liquidation decision. We say that this is the same as Motors liquidation. There is no difference. In Motors liquidation, Judge Gerber ruled against the argument, the legal argument, that the absent party would have made. This Court affirmed Judge Gerber's ruling and specifically held that the legal argument the absent party would have made was incorrect. Nevertheless, in that same decision, on the same page, this Court held that, nevertheless, the absent party was prejudiced because the absent party had been part of the bankruptcy proceedings, and it had noticed it could have made arguments and could have protected itself, and it was not. Yeah, it could have made arguments, but you were heard on the June 16th proceeding in order, right? You were heard on the June 16th proceeding in order, correct? We were heard on the June 16th proceeding, just like the absent claimants in Motors liquidation were heard before this Court when, in 2016, it affirmed Judge Gerber's ruling that the argument the absent claimants would have made was incorrect. So I'm misunderstanding. I thought you were saying that even if it proved that Ms. Ringel's characterization of the state of play, if you will, was correct, and even if that was verified by the June order, you still, in both cases, were able to take steps to avoid the dissipation of the assets of the sale, the proceeds of the sale. Because what we need to focus on is there's two aspects to the June 16 order. The first aspect denied the motion for contempt. However, there's a second aspect. Remember, on February 24, we find out about the sale. On February 25, Judge Moskowitz entered a new escrow order. On March 24, the full First Department freezes all of Prusak's assets, including the money in the Moskowitz-ordered escrow, including the Deckert retainer, which is what the motion, the June 16 motion was about. And the First Department on June 16 specifically says that the issue as to whether the injunction requiring a freeze and requiring a disgorgement in escrow has already been decided. Therefore, it's moot. Therefore, the June 16 order, that part of the June 16 order does not undo Moskowitz's order or the March 24 order. As a result of this freeze, we ultimately collected the money that had been frozen at that point in time. Notably, Deckert, after the June 16 decision, the second one, the revised one, comes back to the First Department and says it makes the same arguments the defendants are making here. The second version of the June 16 order undoes the freeze. But on March 9, 2017, the First Department rejected that argument. It kept the freeze in place. So you have to look at the difference between the contempt application, in which there was a ruling clearly in Deckert's favor, clearly in Mr. Sanford's favor, and also, but apart from that, the ruling on the injunction, which ratified the injunction on March 9, the knobs win on March 24, and which ratified the knobs win on February 25, which froze the remaining proceeds. Had we been on the call, we could have got those orders, the new escrow order, the freeze order, earlier. The January 16 decision did not undo those. If it had undone those, we wouldn't have been able to collect the money that we ultimately did collect. On six separate times, the appellate division has been squarely confronted with this issue. Did the money be escrowed or frozen, or should it be released? And on six separate occasions, it froze the money. On October 22, it ordered an escrow. On December 29, it denied the motion to vacate the escrow. On February 24, February 25, new escrow order. On March 24, new freeze order. On June 16, the request for a disgorgement is moot because the knobs won it. On May 9, 2017, Deckert's argument that the June 16 order had the second version of the June 16 order had undermined the freeze was rejected. The money stayed frozen, and we collected all of it. Had we been on the call, we could have got this same relief earlier. If you look at Judge Coe's decision in Treple v. Dippold, if the due process violation violates or if, but for the lack of notice, the lawyers would have acted differently, they could have protected themselves and protected the client. One more point. Kagan. I'll make it very quick. Okay.  In Matthews v. Eldridge, the important criteria is was there a risk of error. In Doar v. Connecticut, a risk of error is decided, is defined as a not uncomplicated question. If it's a not uncomplicated question, both sides have to be there. Here, our argument that when the December 29 order says the motion to vacate the escrow requirement is denied, it meant what it said, okay? And so you also know it's not a not uncomplicated question because Judge Leibowitz disagrees with Ms. Ringel and Judge Moskowitz. Thank you, Mr. Berry. You have three minutes of rebuttal. We'll hear from Mr. Esposito. Excuse me, Your Honor. Excuse me. Richard Silberberg representing Nathaniel Ackerman and Dorsey and Whitney. Good morning. Morning. As I prepared for this argument earlier this week, I was prepared to lead with the point that the Appellate Division First Department had ruled on two consecutive occasions that the escrow order that was issued in October of 2015 had expired at the time that that court denied the NAFTA's motion for a preliminary injunction in November of 2015. Yesterday, there was a development that caused me to revise my argument because as I stand before you right now, the Appellate Division has now ruled three times that the escrow order was no longer in effect as of November 2015 when the preliminary injunction of the NAFTA was denied. So even if that's so, I'm having difficulty understanding, especially in light of the Inspector General's report, why this phone call and communication was appropriate. If there was ambiguity and clarification was needed in the position of the Appellate Division, you'd have both counsel participating in any call. And of course, we have what that court has now found to have been highly inappropriate at the least. We have findings that the call was orchestrated and paid for, if you will. So although the substantive, I mean, I still see some room for confusion about exactly what the state of play was. And Ms. Ringel's advice may have in the end turned out to be correct. There were still protective measures that may have been taken that would have avoided the dissipation of assets here. And this phone call seems to have allowed a sale to go forward sooner than it otherwise would have happened. And for those proceeds to be dissipated in a context where no one disputes that the and a repayment did not happen except for these legal actions. So could you tell me why I am wrong in taking that approach? Sure, Judge Carney. You had a couple of questions that were embedded in there. So let me try to address. And if I don't fully do that, please let me know. Number one, there was nothing untoward about the January 12, 2016 telephone call. Judge Coates expressly held that there was no constitutional right on the part of the NAFTA to participate in a call that was merely designed to confirm a fact. The fact is that in November of 2015, that escrow order was gone. The time for the NAFTA to have done anything about that was right then and there. They had the opportunity, as Judge Coates found expressly. You don't have to raise your voice. Sorry. They had the right to seek re-argument of the November 15th denial of the motion for preliminary injunction. They had the right to seek to petition for a leave to appeal to the New York Court of Appeals. They did neither. That was the opportunity that they had to escape the legal consequence of the denial of the motion for a preliminary injunction. They were under the impression that the order was still in place, even if it was erroneous, based upon what the, you know, there have been multiple rulings that it was vacated. But if they were under that erroneous impression because it was an ambiguous order that needed clarification, but your clients did not go to the court, as would normally be done, but had a back channel and got an opinion from someone within the court as to what the order is meant, I don't understand why that's not a due process violation if that's, in fact, what happened. Aren't they entitled, if you're going to get clarification and opinion of what an order means, to be present and be heard and to hear that as well? I don't believe so. This goes back to... So if anyone wants to know what an order of this court means or a district court order, they can call the clerk's office and get a legal opinion on what the order means without going to the court? Is that your position? Our position is that as lawyers, we are all obligated to interpret orders as they are considered. We did interpret the denial of the motion in November 2015 as the expiration of that particular restraint. Did we... You were not satisfied. You were not satisfied with that. Your client wanted confirmation of that from the court, and apparently other people wanted to make sure that that was what the court said before this. Fair point. Okay. So if you... Obviously, lawyers have to interpret orders, but when your client makes the decision to have someone in the court office opine on what the order means without notice or opportunity to the other side, I'm having a hard time understanding how that's not a due process violation. Well, I wouldn't say opine. I would say to seek confirmation of what they already knew to be the case. But... I don't know what the distinction you're making there. If she had just read the order and said nothing more, maybe you would have an argument. But that's clearly not what was going on here. They wanted an opinion as to what the order meant. In order... It goes beyond just someone reading what an order says, right? In order to find that there was a due process violation that would preserve the viability of the claims that were asserted, our position is that this court would have to ignore three separate determinations by the appellate division. And the appellate division has the right to characterize their orders in any way they see fit. Let me just explain to you how we could... We could certainly... You haven't answered his question. Why then was the phone call made? The phone call was apparently made in order to confirm in the routine course of making sure that the lawyers had understood the order correctly. Wait a second. In the routine course? I mean, there was a sale that was pending that wasn't going to happen. The title insurance company wouldn't be satisfied, and the sale wouldn't proceed without some greater confirmation than counsel was able to provide independently, is my reading of the record. Is that incorrect? There was... There was a request for confirmation in order for the... I believe it was the title company to have the comfort necessary to close. But I'd like... So there was a very particular purpose for that phone call, wasn't there? There was a particular purpose for that phone call, but I want to say two things. Number one, to you, Judge Bianco, and then one to you, Judge Carney, I want to make it very clear that there has not been a single allegation that Mr. Ackerman or Dorsey and Whitney had any knowledge whatsoever of either the existence of Mr. Esposito in this situation, that Ms. Ringel was married to Mr. Esposito, or that Mr. Ackerman was calling directly Ms. Ringel, who turned out to be married. That's point one. Point two, to you, Judge Carney, I go back to Judge Winter's question at the beginning. Where did the damages flow from? Did they flow from a constitutional deprivation of due process rights? No. As Judge Cote found, those damages could only have resulted from the order that was made by the appellate division in November of 2015. I don't understand why that's the case, precisely because of what I was just saying to you, that the title company, in order for the sale to go forward, the title company was demanding something more than had occurred already. That something more was provided by virtue of the phone call. And the sale might have happened after the June further clarification or confirmation provided by the appellate division, but it looks to me that the phone call was critical to the sale going forward when it did. Is that incorrect? I believe it is incorrect, because now we're indulging in speculation as to what would have occurred in the event that... No, I don't believe that's right, because you were just saying that the title company and the buyer were demanding confirmation that there was no escrow requirement in place and that there was no right of the nots that was maybe equitable or otherwise, but that they were free to go forward with the sale and that there was no escrow requirement in place. And I thought it was that satisfaction of that condition was what enabled the sale to go forward when it did, and therefore it was the phone call rather than the substance of what the appellate division later did in June that permitted the sale and that caused the due process violation here. So tell me in what respect that's inaccurate, please. I'm receiving a note that that'll be addressed by Mr. Feldman, but I do want to say, Your Honor, that yesterday at the appellate division, part of the proceeds was a payment to Mr. Esposito, and there was a turnover proceeding brought by the nots. And what the appellate division held was there was no order in place that required anything other than for those proceeds to be paid out. And all of these arguments were made. Every single one of these arguments was made before the appellate division twice. In November of 2017, the appellate division rejected all those arguments, and again yesterday they rejected all those arguments. Very much. Thank you, Your Honor. Who will we hear from next? Mr. Feldman. Good morning, Your Honor. Let me clarify. Counsel was right in that you were incorrect in your supposition. Pursuant to the orders of the appellate division, there was no restraint on the sale. The sale was going to go forward. The only restraint was on whether the proceeds should be held in escrow post-sale. I was the one who was representing Mr. Sanford, or pursuit, and getting all the proceeds into my escrow account. I called Mr. Sanford, who referred me to Mr. Ackerman, to say, am I going to have to escrow these funds? Based upon my question as to what I have to do with my escrow account, as the last thing I want to do is be in violation of a court order, particularly one from the appellate division, we got on a conference call. Mr. Ackerman called the numbers. I still distinctly remember being transferred. We spoke to a person whose name we did not know who confirmed that procedurally the decision of the board, of the full panel, denying the motion for preliminary injunction as a procedural matter eliminated the TRO requiring escrow of the proceeds. Mr. Feldman, this is not complicated. If they had been on that call, if we believe they had a due process right to be on that call, okay, to learn what you learned on that call, they could have immediately said, oh, there's no escrow order in place, we're going to get one tomorrow, right? They could have done that if they were on that call. If they learned what you learned, that the escrow order was gone, they could have got a new one or applied for a new one tomorrow, and they said they would have been successful because they got one in February. Well, Your Honor, I think, and I'm sorry, my time is running out, but I'll try and respond. Take the time to respond to Judge Bianco. Thank you, Your Honor. I think counsel's being most disingenuous. The escrow order post-closing only dealt with what went to Deckert. The escrow order at the time, as a matter of law, was dissolved on November 15th. Counsel, as Judge Cote rightfully pointed out, had his own obligation at that point, months before this telephone call, to go back to the appellate division and say, wait a minute, we needed an escrow order, a TRO or something, to hold these proceeds, not the sale, the proceeds in escrow. The November order denying the other motion was, again, denied basically on procedural basis. There was nothing to vacate. It was a motion that was made and heard subsequent to the original vacature of the TRO. It's very simple. There was nothing, no opinion was made by the clerk, who we later found out was Rangel, and as counsel here had just said, neither Mr. Ackerman or I had even heard of Mr. Esposito, much less his wife, prior to that. There was nothing pending. There was no action pending at that point, excuse me, nothing before the appellate division pending at that point, other than the vacated TRO. And as the appellate division even heard, decided yesterday, there was no restraints on the escrow at that point. And the sale, by the way, took place two or three weeks after this telephone call. It wasn't the next day. The sale was on February 1st. This was January 12th. You're aware of the timeline. Yes. Thank you very much. Thank you, Your Honor. May it please the Court, Frank Esposito, for Respondent Frank Esposito. I'd just like to address, Your Honors, the nature of the phone call. First, as a preliminary matter, it wasn't an impermissible ex parte communication. Again, please make sure you're speaking into the microphone so Judge Winter can hear. Yes. It was not an impermissible ex parte communication, insofar as the appellate division had already made its determination, and the evidence in the record establishes that the only thing said on that phone call was a procedural fact applicable to any case, that interim relief is just that, interim, that when a full panel decides the motion, the interim relief is vacated. We have two pieces of evidence, the Feldman Memorandum and the subsequently obtained Dorsey Memorandum, that both confirm the only thing said during that call was the procedural fact that interim relief is vacated. If you hadn't had that call and had filed a written motion for clarification of the order, would they have a right to have been present for that motion? And yes or no? I do not believe they would have had a right to be present for a clarification. If you filed a written motion for clarification, you could do that ex parte without the other side knowing it? As an initial matter, Your Honor, with all due respect, no motion was necessary because to any first-year attorney, they know interim relief is just that, interim. And there was no purpose to the phone call then, right? Well, plaintiff's counsel did a fine job of creating an atmosphere of confusion where there should have been none. But I'd like you to answer Judge Bianco's question. He asked if you had filed a written motion for clarification, would your opposing counsel have a right to be present for any discussion of it? It's a hypothetical question that really isn't applicable. We deal with hypothetical questions. Please answer the hypothetical question. I don't know. My role in this was very limited, and I don't believe that any motion would have required the NOPS input. They had an opportunity in notice to be heard. It wasn't inappropriate, but the OCA's report said the opposite, right? The OCA report only said there was an appearance of impropriety, but the OCA report ignored the fact that there was nothing pending and only procedural matters were discussed. Because nothing was pending and because only a procedural fact applicable to any case was discussed, no merits of the case. Why the First Department repeatedly denied the NOPS requests to encumber the property, which, by the way, they had an opportunity in notice to be heard throughout several years, filing lease pendants, motions for constructive trust. Is it true that they made the loans? Well, what you're telling us is that this phone call was totally unnecessary, much less to see that it was directed toward the wife, unknown to everyone, the wife of one of the lawyers. I believe it was unnecessary, but I'm not the attorney who decided to make the phone call. But to me, it was very clear. They allege, at this stage of the proceeding, we have to assume what they allege. And the fact of the matter, Your Honor, with all due respect, is the First Department on arguments exactly like these declined to find contempt. They declined to otherwise disgorge the profits. Once again, you are just saying the phone call was totally unnecessary. I believe the phone call was totally unnecessary, yes, because I know that interim relief is just that, interim, that when the full panel of the First Department decided to deny the requests that the NOPS repeatedly made and the First Department was fully familiar with the facts and fully familiar with all of the repeated arguments over years of the NOPS attempts to encumber this property, they decided that they were not going to hear it any longer, and the full panel decided that they would not grant the relief request. You would be ignoring their allegation that without this clarifying phone call, the sale would have never happened. So that's just a motion to dismiss, and that's what they're alleging. May I respond? I see my time is up. With all due respect, the sale was going forward regardless. The contract for sale had been executed years before any of this. The only issue was, was a certain amount of money going to be escrowed? The sale was going forward either way. All right. Thank you very much. Thank you, Your Honor. We'll hear from Mr. Sanford. Um, one point. I had been given originally four minutes. I had asked to have the full four because of what's happened, the questioning from the court. I think I need to respond because I'm the only person present in this entire courtroom that knows the facts. Please take four. Thank you. Uh, may it please the court. Um, Judge Bianco, I want to address what you just said, and also Judge Carney. Judge Bianco, you said the Knopf's would have been successful if they had participated in that phone call. I need to express very fast and then go through points. I was the only person in the room with Judge Sweeney when that happened. I'm not an attorney. I'm not legally allowed to represent an LLC like pursuit, but because he had in a case, you also affirm judge coach dismissal. I didn't have an attorney, so I had to go there myself. So I was there for the Sweeney. I'm sorry. I didn't understand that. I'm sorry. Sure. I'll go fast, but I'll go slow. There were two defendants, yourself personally and pursuit. No, actually, Your Honor, there were about five. What happened was all my entities are LLCs and just for one second. No, the loans did not go to pursuit. It's in the record in the Phillips case that he acknowledged there were no loans to pursuit in his affirmation for summary judgment, he said all the loans went to Michael Sanford and Norman Knopf was deposed after summary judgment and said all the money went to me to buy a piece of my investment business. That's what this entire case is about. Abuse of processes is in the record. Everything is in the Phillips record. He said both cases would be tandem. If someone would please, I'm saying this with all due respect, please read my memo of law in Phillips. You will see all the citations there. I will give you the page right now in Phillips to see the pages right now. Um, give me one moment in Phillips. My memo of law is a three, four, four, seven to eight, uh, three, four, four, nine, and that gives direct quotes that in reference to deposition pages and quotes from Norman Michael Knopf. And I'm not trying to disparage him, but I'm simply given a fact of law. They, uh, Mr. Knopf was in prison for a real conspiracy in the Southern district with fake financial statements. And that is what is happening here. Mr. Berry left out deposition testimony and faked the numbers. And then he changed the elements in the contracts. Wait, wait, wait a second. We're going. There was no money to pursue me. That was your question. We're going, well, we're going very far afield. So I'll go back to, we have a proceed. We're in the proceed procedural posture of having had a motion to dismiss granted in that posture, as you're aware, please do. Okay. So on that, um, judge Bianco had asked, would they have not won? And that was another misrepresentation because I was there for that entire series of events. Here's what happens in the record with Dorsey's papers in July of 2015, Mr. Berry went for pre-judgment attachment against pursuit. And so everyone understands pursuit simply owned my homes and held all my assets. My other entities were my businesses where I made money. So I put my savings into pursuit and thus if they sued pursuit, I did not have a lawyer, I couldn't defend it. And if they put it in Liz penance on since pursuit had gutted all their properties, I was renovating. I couldn't get any money out or continue to renovations. So I was frozen of Liz penances. And then they tried to get a pre-judgment attachment on pursuit and they were denied in July, 2015 denied. Let me ask you, I mean, we, even with your expanded time, there's very little time left. I want to, I want to make sure you, you have had an opportunity to file with the benefit of counsel, um, as, as you've chosen, um, your, uh, rendition of the procedural facts that we're entitled to look at and your, your brief, uh, and to have a voice in each of these multiple pending cases, correct? Only a few cases, some cases I was not allowed to, and I did not have counsel on any of the ones, the last four. I had to enter into pursuits case on my own volunteered to be sued because there was no lawyer for pursuit. There was no law. You're in charge of whether there's a lawyer for pursuit or not. That's your end. No, the problem was by suing pursuit and putting those dependencies on and then suing all pursuits lawyers, there was no opportunity for an attorney as judge coach said in her March 5th, 2018 decision under appeal by suing attorneys with the most of out of good faith basis to bring a cause of action against them. And by his threats to an harassment of counsel, Barry has sought to isolate Sanford and deprive him of the assistance of counselors. Mr. Sanford. Um, I'm concerned that we're, um, kind of all over the map here. I'd like to get back to judge Bianco's question about they would have been successful July, 2015. Why didn't you take two minutes to do that? And then I think we'll call it a day. That's fine. Judge Braun denies their prejudgment attachment. Then they go to the appellate division and ask when I'm sitting there for a predetermined attachment, pending appeal, and they're denied. Then they lose the notice of penancy, which we see at the appellate division and they run to coat and through a new notice of penancy on their judge coat. I'm sorry, judge, judge coat. I'm sorry. That's how we refer to judges. And they run to judge coat. She then canceled that notice of penancy. Then when she cancels it, it's supposed to be on October 20th and there's no lawyer for pursuit. They run to justice Sweeney. I had to appear and justice Sweeney asked me, are you now going to sell PHC? And I say yes to hire counsel for pursuit. And he, and Mr. Berry says is in the record. He has a motion pending, um, for, um, a review of the notice of penancy, which was canceled and could justice Sweeney put on an order until the prior order is resolved. The prior order gets resolved November 12th against the Knopf's. So what Mr. Berry said to you, well, later on, everything went their way. No. When I was able to sell the apartment, I hired Deckert and Deckert voluntarily gave them that TRO in February, March. They did not win that TRO that was voluntarily given pending the determination of the June motion, which we won. They've never won truly anything. So if they were on a call, the prior history of losing repeatedly on the same issues would have come up. And why would they ever receive restraint at the notice? Because the penalty was canceled in the state and federal court, prejudicement attachment was denied, and injunction was denied. Mr. Sanford, thank you very much. Thank you, Your Honor. Thank you. Mr. Berry, you have three minutes of rebuttal, and I'd like to keep you to that time. This is not a situation where Mr. Sanford was just calling or having his attorneys call Ms. Ringel to assess the risk that they would be violating the order. They were calling Ms. Phillips and Mr. Phillips' title company to close on terms that permitted the release of monies from escrow. To quote Phillips' brief in the next upcoming appeal, Braverman, Phillips' attorney, did nothing wrong by suggesting this call since all she wanted to learn was what the order meant from court personnel. Mr. Ackerman, when Mr. Ackerman was deposed, said that he told Mr. Feldman that he didn't think there would be a problem. And so I asked him, well, if that was the case, why did you need to make the call? And Mr. Ackerman says that wasn't that good enough for him. And Mr. Ackerman says it apparently was not. These are situations where all the parties to the transaction needed court clarification. And that means that it's state action. It's under color of law. If you look at Monroe v. Pape, which, although overruled on Monell grounds, is still good law with the definition of color law, it was issued with clothe with the authority of law. That's what they were insisting on. That's what Phillips was insisting on. Recently, the first department defined state action as if the government employee is doing what no private individual could do. These guys, the defendants, have admitted that no private individual's opinion was good enough for them. And there's a good reason for that. The decision, the last word from the appellate division as of the date of the call was as follows. Kagan, please, please speak into the microphone so Judge Winters can hear you. The last word of the appellate division as of the date of the call was as follows. On December 29, it determines the motion to vacate the escrow requirement in which all these arguments, every single argument made today, was made in support of the motion to vacate. And the appellate division says defendants have been cross-moved for vocature of the certain interim order of October 22. It is ordered that the motion for re-argument is denied. That's our motion. The cross-motion for vocature of the interim order dated October 22 is denied. We can't appeal this. We're not an aggrieved party. And the argument is that this is just obvious. Oh, it was denied, but it meant granted. How many different times has every judge in this courtroom granted a deny the motion to vacate it, thinking I want to let that procedure go forward? I want to keep that order in place. Therefore, I'm going to write vacated. Our claim was not merely colorable. It was highly reasonable. Our position was highly reasonable. Judge Leibowitz has issued a 45-page decision on January 18 dealing with every single aspect of this. Thank you. Thank you very much. The red light's on. We'll reserve decision on these.